**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

VIRGILIO AGUILAR MENDEZ,

               Plaintiff,

v.                                  Case No.: 3:24-cv-195-WWB-PDB

MICHAEL KUNOVICH and GAVIN
HIGGINS,

               Defendants.

_____/

## <u>ORDER</u>

THIS CAUSE is before the Court on Plaintiff's Motion for Partial Summary Judgment (Doc. 117), Defendants' Motion for Final Summary Judgement (Doc. 119), and the responses and replies (Doc. Nos. 123, 126, 127, 128) thereto.  For the reasons set forth below, Defendants' Motion will be granted as to Count I and Plaintiff's remaining state law claims will be dismissed without prejudice.

## I.    BACKGROUND

Plaintiff Virgilio Aguilar Mendez was stopped by Defendant Michael Kunovich, a sergeant with the St. John's County Sheriff's Office ("**SJCSO**"), in an area of St. Agustine, Florida frequented by local law enforcement officers and considered to be "high crime." (Doc. 112-4 at 30:3–31:8, Doc. 112-5 at 54:23–55:2; Doc. 112-15 at 2–3; Doc. 118-1 at 0:28–32; Doc. 118-3 at 1).  The pair eventually struggled in a confrontation joined by multiple officers and bookended by Plaintiff's arrest and Kunovich's death from cardiac dysrhythmia.  (Doc. 118-5 at 8, 20; Doc. 118-8 at 2; *see also generally* Doc. 118-1).  Due, in part, to Kunovich's death, the summary judgment record is sparse with respect to

evidence of the earlier stages of Plaintiff's stop.[1]  For these stages of the encounter, the Court relies on and describes video evidence from Kunovich's body-worn camera ("**bodycam**") to the extent it is available.  *See United States v. Thomas*, 160 F.4th 1177, 1183 (11th Cir. 2025) ("[W]hen the record contains video evidence, the authenticity of which is not challenged, the court should ordinarily view the facts in the light depicted by the video evidence." (quotation omitted)).  However, the Court pauses to note that Kunovich's bodycam footage is incapable of resolving contested factual matters that occurred before it began recording.

Plaintiff sat outside eating dinner on the night of May 19, 2023.  (Doc. 112-1 at 15:7–15; Doc. 112-15 at 2).  He claims that he was eating outside of a Super 8 Motel he was living in and also that he was sitting and eating outside of an adjacent abandoned building.[2]  (Doc. 112-1 at 15:7–15; Doc. 112-15 at 2; *see also* Doc. 112-4 at 58:5–59:14 Doc. 112-5 at 46:16–47:3).  Defendants claim that in a post-arrest interview, Plaintiff admitted he saw Kunovich approaching in his patrol vehicle, stopped eating, got up, and

---

[1] Neither Plaintiff's Deposition (Doc. 112-1) nor his Declaration (Doc. 112-15) detail many crucial moments of his encounter with SJCSO officers.  For instance, when asked at his deposition whether he started to walk away from Kunovich after being told to turn around, Plaintiff responded that he "w[ould] not say anything about it."  (Doc. 112-1 at 19:2–3).  Plaintiff similarly declined to explain several other contested points of his encounter with SJCSO officers.  (*See id.* at 19:4–8, 23:5–7, 26:21–27:7, 28:6–14).  At other points—for example, when asked what he saw on Kunovich's body-worn camera recording, or why he took certain actions depicted in the video—Plaintiff responded only by saying, "I don't know."  (*See id.* at 20:19–22, 24:4–9, 25:23–25, 26:8–14, 28:19–29:18, 30:10–21, 31:8–13, 32:13–15, 34:15–21, 38:25–39:2, 43:7–8, 45:11–13).  The apparent problem may have laid with Plaintiff's interpreter, though Plaintiff claimed to understand him.  (*Id.* at 33:20).  But Plaintiff "d[id]n't understand" whether there was a reason he had difficulty answering so many questions; he likewise "d[id]n't know" whether he was even having difficulty to begin with.  (*Id.* at 33:13, 33:18).

[2] One deputy testified that the two buildings are "kind of attached . . . by an overhang."  (Doc. 112-5 at 45:25; *see also id.* at 48:5–12).

began walking away.  (Doc. 118-3 at 2; Doc. 118-8 at 2).  Plaintiff alleged the same in his Corrected Second Amended Complaint.  (Doc. 44, ¶¶ 32–33).  He now claims that he did not see Kunovich until after he had begun walking.  (*See* Doc. 112-1 at 12:9–14, 13:5–15; *but see id.* 12:19–13:4; *id.* at 15:17–18; Doc. 112-15 at 2 ("Back at the Super 8 Motel, I decided to eat my dinner outside. . . . While eating, I saw a police officer, which was later determined to be Officer Michael Kunovich.")).  In any event, around 9:00 p.m., Kunovich exited his marked patrol vehicle wearing his issued SJCSO uniform and yelled at Plaintiff, who was walking away on the sidewalk, to stop.  (Doc. 112-15 at 3; Doc. 118-1 at 0:23–0:32; Doc. 118-5 at 5; Doc. 118-8 at 2).

Approaching Plaintiff, Kunovich radioed in his location and reported a suspicious person.  (Doc. 112-2 at 13:11–13, 15:10–16; Doc. 118-1 at 0:22–0:48).  During the transmission, Plaintiff began to drift down the sidewalk again, and Kunovich again told Plaintiff to stop.  (Doc. 118-1 at 0:40–0:50).  Kunovich then asked Plaintiff, "Why, when I was driving around . . . why did you get up and walk away?"  (*Id.* at 0:50–0:57).  Plaintiff, who has difficulty speaking English, struggled to respond.  (*Id*. at 0:56–1:06).  After Kunovich asked again, Plaintiff pointed in different directions and communicated through words and gestures that he was purchasing a drink from a nearby store.  (*Id.* at 1:00–1:06).  Kunovich then asked Plaintiff where he was staying.  (*Id.* at 1:05–1:09).  Plaintiff pointed toward the Super 8 Motel.  (*Id.* at 1:06–1:11; Doc. 112-1 at 16:7–8).  Kunovich then asked Plaintiff, "Well, why aren't you eating inside?"  (Doc. 118-1 at 1:11–1:13).  Plaintiff replied, "Sorry," and said that he did not speak English.  (*Id.* at 1:15–1:18; *see also* Doc. 112-15 at 3). At that point, Kunovich told Plaintiff that he had someone coming and asked Plaintiff for his name and identification.  (Doc. 112-4 at 26:14–19, 42:16–21;

Doc. 118-1 at 1:17–1:32).  Plaintiff indicated that his ID was at the Super 8, but in response to being asked about his name, he replied that he did not speak English.  (Doc. 118-1 at 1:17–1:32).

Kunovich next asked Plaintiff if he had any weapons.  (*Id.* at 1:30–1:35).  Plaintiff replied, "Huh?"  (*Id.*).  Quickly, Kunovich asked again, and Plaintiff said, "No."  (*Id.*).  Kunovich then said, "Well, you know what that is.  Turn around, let me look."  (*Id.* at 1:35–1:41).  Grabbing Plaintiff by the arm, Kunovich signaled for him to turn around.  (*Id.*).  Plaintiff complied to an extent—rather than turning around in place, however, Plaintiff appears to have turned to begin walking away from the encounter altogether, saying, "No, sorry."  (*Id.* at 1:38–1:43).  Kunovich commanded Plaintiff to stop walking and stop pulling away, telling him, "I'm checking you for weapons."  (*Id.* at 1:38–1:47).  At that point, Plaintiff's left hand drifted onto his shorts' left-front pocket.[3]  (*Id.* at 1:44–1:54).  Kunovich grabbed Plaintiff's hand, yelling, "Stop," and "Get your hands away."  (*Id.*).  Plaintiff appears to have wrestled to keep his hand on his pocket as Kunovich tried unsuccessfully to pry it away.  (*Id.*).  It then appears that Plaintiff slipped from Kunovich and ran down the sidewalk, only to be re-apprehended a moment later as the two continued to wrestle with one another.  (*Id.* at 1:55–2:05; Doc. 112-2 at 17:24–18:15).  At this point, Defendant

---

[3] As recounted below, Plaintiff retrieved a knife from his shorts pocket several minutes later.  (*E.g.*, Doc. 112-5 at 22:10–18).  At his deposition, Plaintiff stated that he was "trying to stop" Kunovich from pulling his shirt, that he "was just fixing [his] shorts," and that he was "just [] checking . . . what [he had] there."  (Doc. 112-1 at 17:7–22).  After watching the relevant portion of Kunovich's bodycam footage, Plaintiff was asked again whether he reached for his pocket before Kunovich touched his shorts.  (*Id.* at 19:4–5).  Plaintiff replied, "I'm not going to say anything.  Just watch the video."  (*Id.* at 19:7–8).  The video obscures Plaintiff's movement but shows Kunovich, initially with both hands on Plaintiff's right arm, quickly remove his left hand to grab at Plaintiff's left pocket while telling Plaintiff to get his hands away from his pockets.  (Doc. 118-1 at 1:40–1:54).  Plaintiff's left hand was, indeed, on his pocket.  (*Id.*).

Gavin Higgins, a deputy with SJCSO, arrived in response to Kunovich's suspicious-person report. (Doc. 112-2 at 13:11–15, 16:13–17; Doc. 118-1 at 2:00–2:08). Higgins did not see Plaintiff break away from Kunovich but testified that he was nonetheless "trying to flee" and that "Kunovich was holding onto him and trying to prevent that from happening." (Doc. 112-2 at 38:17–23).

Kunovich and Higgens struggled for over three minutes to wrestle Plaintiff onto the ground and into handcuffs before they were joined by a third officer, Deputy George Montgomery (Doc. 118-1 at 2:00–5:10; *see also* Doc. 112-2 at 16:22–25, 19:25–26:25; Doc. 118-7 at 0:00–2:42). One minute later, the officers finally secured Plaintiff in handcuffs after Montgomery delivered two to three knee strikes to Plaintiff's ribs. (Doc. 112-4 at 24:21–25:3; Doc. 112-8 at 72; Doc. 118-1 at 6:05–6:15; *see also* Doc. 112-1 at 35:4–9; Doc. 118-7 at 2:40–3:38). At that point, additional deputies arrived and took control of Plaintiff, who remained on the ground, from Kunovich, Higgins, and Montgomery. (Doc. 112-4 at 25:5–12; Doc. 118-1 at 6:35–7:20). Moments later, the newly arrived deputies discovered and forcibly removed from Plaintiff's grasp a knife he had retrieved from his shorts' pocket. (Doc. 112-1 at 24:14–17; Doc. 112-5 at 22:10–23:4; Doc. 118-7 at 5:15–5:32; Doc. 118-8 at 2). Plaintiff claims that he was "just trying to throw [the knife] away" because he was "not trying to hurt anybody." (Doc. 112-1 at 24:5–6).

Earlier, during the melee, the officers repeatedly commanded Plaintiff to get on the ground, to give up his hands, and to put his hands behind his back. (Doc. 118-1 at 2:00–6:10). At one point, Kunovich warned Higgins that Plaintiff might be reaching toward Higgins's gun. (Doc. 112-2 at 29:15–20; Doc. 118-1 at 2:46–2:50). Plaintiff attempted to communicate throughout the episode by saying "Stop," "Sorry," "Family," "No problem,"

5

and "No speak English," but continued to fend off the officers' attempts to bring him down and place him in handcuffs. (Doc. 118-1 at 2:00–6:10). At one point, Plaintiff fought to a standing position and momentarily freed himself from Kunovich, but Higgins used a leg sweep to take Plaintiff back to the ground. (*Id.* at 3:00–3:14; Doc. 112-2 at 20:2–12; Doc. 118-7 at 0:34–0:40).

Kunovich tased Plaintiff several times in "drive stun" mode throughout their grappling match.[4] (Doc. 118-1 at 3:14–3:19, 3:44–3:52, 4:30–4:40; *see also* Doc. 112-1 at 28:3–5 (Plaintiff stating he was tased "four [] or five times"); Doc. 118-3 at 2 (declaring that Plaintiff recalled being tased twice in his post-arrest interview)). Plaintiff screamed in pain as he kicked and swatted the taser away, at one point grabbing ahold of it and refusing to let go. (Doc. 112-2 at 21:1–22:25; Doc. 112-15 at 4; Doc. 118-1 at 3:44–4:02). He did let go, however, after Higgins put him in a rear naked chokehold for "less than a few seconds." (Doc. 112-2 at 26:18). The chokehold was otherwise "not successful" because it failed to make Plaintiff unconscious. (*Id.* at 26:17–23; *see also* Doc. 112-1 at 41:19–24). After that, Plaintiff once again wrestled to his feet, but was quickly thrown to the ground by Montgomery, who had just arrived at the scene to see Plaintiff continue "trying to pull away and get away from Deputy Higgins." (Doc. 112-4 at 18:17–19:3; *see also* Doc. 118-1 at 4:55–5:10; Doc. 118-7 at 2:25–2:42).

---

[4] When a taser is used in drive stun mode, "the weapon is pressed against a person's body and the trigger is pulled resulting in pain (a burning sensation)." *Hoyt v. Cooks*, 672 F.3d 972, 975 n.4 (11th Cir. 2012) (quotation omitted); *see also Chambers v. United States*, No. 5:11-CV-420-OC, 2013 WL 4080118, at *1 n.2 (M.D. Fla. Aug. 13, 2013) (quoting expert's testimony for proposition that, in drive stun mode, "the device . . . does not have incapacitation capability, it functions only as a pain compliance tool").

After several deputies secured Plaintiff's knife, Higgins, tired, walked away from the scene to grab a bottle of water.  (Doc. 112-2 at 34:20–35:8).  He handed an extra bottle to Kunovich, who collapsed shortly thereafter.  (*Id.* at 35:11–13).  Kunovich was taken to Flagler Hospital, where he was pronounced dead.  (Doc. 118-8 at 2).  Plaintiff was taken into custody and interviewed in Spanish by SJCSO Lieutenant Jose Jiminez. (Doc. 118-5 at 7; *see also id.* at 34–39; Doc. 112-1 at 10:4–22).  Thereafter, Plaintiff was formally arrested and charged with resisting an officer with violence and felony murder. (Doc. 118-5 at 8; *see also* Doc. 118-8 at 1–6).  The State dropped the charges the following year.  (Doc. 44-4 at 1).

Plaintiff initiated the instant action In February 2024.  He brings claims against Kunovich for a violation of his Fourth Amendment rights pursuant to § 1983 (Count I) and intentional infliction of emotional distress under Florida law (Count X).[5]  (*See* Doc. 44, ¶¶ 113–130, 226–239).  Plaintiff also alleges that, under Florida law, both Kunovich and Higgins falsely arrested and battered him (Counts II–III).  (*See id.* ¶¶ 131–143).

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it may "affect the outcome of the suit under the governing law."  *Id.*  "The moving party bears the initial burden of

---

[5] Plaintiff proceeds against the Personal Representative of Kunovich's estate. (Doc. 44, ¶ 13).

showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

## III.    DISCUSSION

Defendants argue that Kunovich is entitled to qualified immunity on Plaintiff's § 1983 claim. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted). "An official who asserts entitlement to qualified immunity must first establish that . . . he was acting within the scope of his discretionary authority." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). Here, Plaintiff does not contest that performing an investigatory stop is safely

within an officer's scope of authority. *See Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (stating that on-duty police officers "conducting arrest and investigative functions" "readily satisf[y the scope-of-authority] requirement").

Kunovich is, therefore, "entitled to qualified immunity under § 1983 unless (1) [he] violated a federal statutory or constitutional right, and (2) the unlawfulness of [his] conduct was clearly established at the time" he seized Plaintiff. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quotation omitted). Plaintiff bears the burden of establishing that qualified immunity is inappropriate. *Alcocer*, 906 F.3d at 951. Plaintiff's failure to make that showing as to either prong is fatal, and the Court need only find that one is lacking. *See id.*; *Pearson*, 555 U.S. at 236.

Here, clearly established law is limited to binding precedent of the Florida Supreme Court, the Eleventh Circuit, and the Supreme Court of the United States, and does not include policies implemented by the SJCSO. *See, e.g.*, *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009). The Supreme Court has repeatedly emphasized that for the purposes of qualified immunity, a "clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019). Police officers, therefore, "are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)). To make this showing, a plaintiff must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017). The case need not be "directly on point," but it "must place the lawfulness of the particular [seizure] beyond debate." *Wesby*, 583 U.S. at 64 (quotation omitted). Otherwise, qualified immunity

9

remains appropriate unless the plaintiff makes one of two showings.  The first is "the existence of a 'broader, clearly established principle that should control the novel facts of [his] situation.'"  *Richmond v. Badia*, 47 F.4th 1172, 1184 (11th Cir. 2022) (alteration in original) (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)).  The second occurs "in rare instances and if no materially similar caselaw exists," where "an official may still have notice when their conduct violates a constitutional right with obvious clarity."  *Id.*  In sum, to "[p]ut [it] simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

### A.  Violation of the Fourth Amendment (Count I)

Plaintiff's labels Count I as a claim for an "[u]nconstitutional [s]earch and [s]eizure." (Doc. 44 at 16).  Within Count I, Plaintiff includes separate but fleeting allegations pertaining to an unlawful investigatory (or *Terry*) stop and frisk, an unlawful search and seizure, and an unlawful arrest.  (*Id.*, ¶¶ 118–123); *see also United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006) (enumerating the three categories of police-citizen encounters for purposes of the Fourth Amendment: "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests").  However, Plaintiff moved for summary judgment on Count I only insofar as it raised a claim for an unconstitutional stop and frisk.  (*See* Doc. 117 at 10–19).  Thereafter, Defendants confusingly injected arguments pertaining to Plaintiff's arrest, as distinct from his stop, in their Motion's discussion of Count I, and Plaintiff followed suit in his Response.  But to the extent that Plaintiff even alleged an unlawful arrest claim in Count I, he has since waived it by unambiguously confirming at the motion to dismiss

10

stage that he asserts no federal claim for false arrest—"an arrest [made] without probable cause." *Hardigree v. Lofton*, 992 F.3d 1216, 1229 (11th Cir. 2021) (quotation omitted); (*see also* Doc. 55 at 15 ("False arrest is a state claim unless it is alleged under Section 1983. That is not the case here.")). The Court therefore disregards the parties' arguments relating to an unlawful arrest in its analysis of Count I.

A person is seized within the meaning of the Fourth Amendment when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Andre v. Clayton Cnty.*, 148 F.4th 1282, 1292 (11th Cir. 2025) (quoting *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991)). "But a seizure alone is not a violation of the Fourth Amendment." *Id.* at 1297. Rather, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "Once an officer has legitimately stopped an individual, the officer can frisk the individual so long as 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (quoting *Terry*, 392 U.S. at 27). For the purposes of qualified immunity, an officer making an investigatory stop-and-frisk only violates clearly established law when he lacks an arguable reasonable suspicion to make the stop or the frisk. *See Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000). The arguable reasonable suspicion inquiry hinges on whether, under the totality of the circumstances, "a reasonable officer could have believed that [his actions] comported with the Fourth

11

Amendment." *Meshal v. Comm'r, Ga. Dep't of Pub. Safety*, 117 F.4th 1273, 1288 (11th Cir. 2024) (quotation omitted).

Plaintiff appears to concede that he was not seized under the Fourth Amendment until Kunovich grabbed and began to search him. (*See* Doc. 112-15 at 4; Doc. 117 at 5; Doc. 123 at 9); *cf. Moore v. Pederson*, 806 F.3d 1036, 1044 (11th Cir. 2015) ("A *Terry* stop is a type of seizure under the Fourth Amendment . . . ."). Defendants, however, argue as if Kunovich detained Plaintiff immediately after exiting his vehicle. (*See* Doc. 119 at 11–14). The Court agrees more with the latter assessment. An officer seizes a suspect by show of authority when "'the officer's words and actions would have conveyed . . . to a reasonable person' that 'he was being ordered to restrict his movement,' and those words and actions actually 'produce his stop.'" *United States v. House*, 684 F.3d 1173, 1199 (11th Cir. 2012) (quoting *Hodari D.*, 499 U.S. at 628–29). Here, Kunovich loudly yelled "Stop" as he exited his vehicle and approached Plaintiff. Seconds later, as Kunovich reported a suspicious person on his radio, Plaintiff began to walk away. Again, Kunovich told him to stop. In doing so, Kunovich reasonably disabused Plaintiff of the opportunity to "decline to listen to [Kunovich] and [] go on his way." *Florida v. Royer*, 460 U.S. 491, 498 (1983). And because Plaintiff complied, at least temporarily, and stopped to speak with Kunovich, the latter's show of authority produced an investigatory stop or seizure. *See Corbitt v. Vickers*, 929 F.3d 1304, 1308, 1313 (11th Cir. 2019) (finding that bystander was seized where "officers demanded all persons in the area . . . get down on the ground" and the bystander "clearly yielded [by lying] face down on the ground pursuant to [their] orders").

Plaintiff highlights that Kunovich, being deceased, cannot articulate a reasonable suspicion for performing the stop. According to Plaintiff, "[t]his leaves only" his own, "undisputed" version of the facts, wherein Plaintiff never fled from Kunovich, whom Plaintiff only saw after he was stopped. (Doc. 117 at 15). However, both Plaintiff's Declaration and Corrected Second Amended Complaint dispute this characterization of events. In the former, careful ordering of Plaintiff's statements suggests that he saw Kunovich after he stopped eating and began walking away to buy a drink, but the content of those statements confirms that he saw Kunovich "while eating" and "then got up to buy a drink." (Doc. 112-15 at 2). Likewise, in the latter, Plaintiff alleged that "he saw [Kunovich] driving by" while he ate his dinner outside and "then got up to [walk to] buy a soda." (Doc. 44, ¶¶ 31–33). Nevertheless, the Court considers Kunovich's assertion of qualified immunity with Plaintiff's "best case in hand," *Hammett v. Paulding Cnty.*, 875 F.3d 1036, 1052 (11th Cir. 2017) (quotation omitted), and therefore assumes that Plaintiff began walking without first seeing Kunovich.

Plaintiff, however, still retains the burden of showing that qualified immunity is inappropriate, and this is not a case where accepting Plaintiff's facts precludes finding a reasonable mistake on the part of Kunovich. *See Pearson*, 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." (quotation omitted)); *cf. Manners v. Cannella*, 891 F.3d 959, 969 (11th Cir. 2018) (finding a material factual dispute where crediting plaintiff's "consistent[]" testimony would allow jury to find that defendant officer neither saw nor reasonably believed he saw alleged crime); *Hudson v. Hall*, 231 F.3d 1289, 1297 (11th Cir. 2000) (finding a material

13

factual dispute where "no reasonable officer in Officer Hall's circumstances could have understood no consent at all to constitute a voluntary consent").  Here, even if Plaintiff did not see Kunovich approaching in his marked patrol car and, thereafter, begin to walk away, Kunovich could still have reasonably believed Plaintiff was purposely walking away from him.  Indeed, when Kunovich pulled over and exited his vehicle, Plaintiff *was literally walking away from him*.  (Doc. 118-1 at 0:23–0:32).  And Kunovich's bodycam footage memorializes that his suspicion toward Plaintiff was based on the belief that Plaintiff got up and began walking away only upon seeing Kunovich approaching.  (*Id.* at 0:50–1:02).  Kunovich's subjective beliefs are, of course, immaterial.  What is material is Plaintiff's failure to offer evidence or factual allegations that tend to suggest Kunovich's belief was unreasonable.  "[A]ny kind of flight, even walking away, might support a finding of reasonable suspicion."  *United States v. Franklin*, 323 F.3d 1298, 1302 (11th Cir. 2003) (citing cases).  Indeed, because police officers are "entitled to [reasonably] rely on a suspect's reaction to their presence," even "flinch[ing]" in response to the sight of an officer may, based on the circumstances, provide that officer with a reasonable suspicion to detain the suspect. *United States v. Turner*, 684 F. App'x 816, 820–21 (11th Cir. 2017). Thus, if Plaintiff did not see Kunovich approaching, Kunovich could still have "reasonably but mistakenly conclude[d] that reasonable suspicion [was] present" based on his perception of Plaintiff's flight.  *Jackson*, 206 F.3d at 1165.

Additionally, when Kunovich stopped Plaintiff, a reasonable officer would have known that it was nighttime.  He would have known that law enforcement officers frequently responded to calls from the area and considered the neighborhood to be "high-crime," regardless of Plaintiff's unsupported factual assertion that the area is not actually

14

a high-crime zone.  He would have known that he was approaching Plaintiff outside of an abandoned building.  And he would have observed Plaintiff, for the second time, begin to walk away after having already told him once to stop.  Each of these factors is relevant to a finding of arguable reasonable suspicion.[6]  Crucially, Plaintiff's Response fails to address the majority of these factors and simply repeats that "Kunovich never articulated reasonable suspicion—because he died before doing so." (Doc. 123 at 6).  But because Plaintiff has the burden of showing that Kunovich lacked even an arguable suspicion for stopping him, this fact is inadequate to preclude qualified immunity.  So too is a single citation to *Terry v. Ohio*, supplied at Defendants' invitation for an on-point case that would have put Kunovich on notice of the unlawfulness of his actions, for the proposition that investigatory seizures require reasonable suspicion.  And to the extent that Plaintiff argues in his own Motion that a clearly established principle of reasonable suspicion should govern the facts of his stop, he cannot aggregate the principle from half a dozen

---

[6] *See Wardlow*, 528 U.S. at 120 ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."); *United States v. Bishop*, 940 F.3d 1242, 1249 (11th Cir. 2019) ("[A]rgumentative or non-compliant behavior [may] give rise to a reasonable suspicio[n]."); *United States v. Heard*, 725 F. App'x 743, 754 (11th Cir. 2018) ("Factors like known criminal activity in an area; time of day; proximity, both temporal and geographic, to reported suspicious activity; unusual nervousness; and refusal to cooperate can certainly contribute to reasonable suspicion."); *Clark v. City of Atlanta*, 544 F. App'x 848, 854 (11th Cir. 2013) (finding a reasonable suspicion where "the property where the Clarks were standing appeared to be vacant" because "vacant properties were often targeted for burglaries"); *United States v. Gordon*, 231 F.3d 750, 756 (11th Cir. 2000) (finding it relevant that Gordon was "sighted standing, at night . . . surrounded by largely abandoned buildings, in an area notorious for violent crime and drug trafficking," but noting that, without his flight, "these facts would not have justified [a] stop"); *United States v. Spencer*, No. CR419-086, 2019 WL 5092481, at *3 (S.D. Ga. Oct. 10, 2019) (stating that "[c]ourts have frequently recognized that loitering near abandoned buildings is a basis for reasonable suspicion of criminal activity" and collecting cases), *report and recommendation adopted*, 2019 WL 6597848 (S.D. Ga. Dec. 4, 2019).

cases—some analyzing probable cause, and some standing for a proposition contrary to Plaintiff's reading—making a pronouncement on just one or two of the above factors in isolation. Finally, Plaintiff makes no attempt to show that this is one of the "rare" cases in which "the officer's acts were so egregious that preexisting, fact-specific precedent [is] not necessary to give clear warning." *Moore*, 806 F.3d at 1049 (quotation omitted). Plaintiff therefore fails to establish that Kunovich violated clearly established law as to the stop.

As to the frisk, Defendants first argue that, because of Plaintiff's resistance, it never even occurred. But Defendants cite no authority for this argument. And while unsuccessful attempts to seize a person by show of authority lay beyond the scope of the Fourth Amendment, *see Hodari D.*, 499 U.S. at 626, Eleventh Circuit precedent suggests that a frisk need not be completed to occur, *see United States v. Matchett*, 802 F.3d 1185, 1189–90 (11th Cir. 2015). The Court therefore assumes Plaintiff was frisked.

In *Matchett*, a police officer observed a suspect, Matchett, walking down a sidewalk at 9:00 a.m. carrying an unboxed television. *Id.* at 1189. The officer stopped Matchett and asked for his identification. *Id.* Matchett became "scared" and "tense" after the officer's request. *Id.* In feigned attempts to search for his identification, Matchett avoided his front right pocket, and the officer therefore suspected it might contain a weapon. *Id.* at 1190. After the officer began frisking Matchett and felt a handgun, he asked Matchett why he had it. *Id.* "Matchett then physically pulled away . . . and tried to run away." *Id.* Only after the pair engaged in a "wrestling match" lasting "[w]ell over three minutes" was Matchett's handgun, which had fallen to the ground, actually seized by police. *Id.* The

16

Eleventh Circuit, considering the facts above, found the officer's frisk to be lawful. *Id.* at 1193. So too was any frisk Kunovich performed.

Like Matchett, Plaintiff failed to produce identification. *See United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010) (finding it relevant that suspects could not provide identification). Like Matchett, Plaintiff's demeanor changed in response to relevant questioning, as he demonstrated enough English comprehension to communicate where he was living and what he was doing but shut down questions pertaining to his name and possession of weapons. Like the officer in *Matchett*, Kunovich approached Plaintiff alone, which would "bolster[ an officer's] reasonable concern for his safety." *Matchett*, 802 F.3d at 1193. But unlike the officer in *Matchett*, Kunovich stopped Plaintiff at night. *See White*, 593 F.3d at 1203 (stating that officer's presence in a "high-crime area late at night" "support[ed] the objective reasonableness of [his] search"). And while Plaintiff did not avoid his pocket, it was certainly more threatening to grab at it after multiple (apparent) attempts to leave the encounter altogether. Under these circumstances, a reasonable officer may have "believe[d] himself to be in danger and may [have] wish[ed] to determine quickly whether [Plaintiff was] armed." *United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1987). Moreover, Plaintiff has not shown or even attempted to show that the law regarding his frisk was clearly established at the time it occurred. Rather, Plaintiff again assumes that his frisk was per se unlawful because Kunovich did not contemporaneously articulate his justification for it and cannot possibly do so now. This, again, sidesteps qualified immunity's objective arguable reasonableness inquiry, which Kunovich remains entitled to despite being deceased. Plaintiff has thus failed to show that qualified immunity

17

is inappropriate as to both his stop and his frisk, and Kunovich is entitled to summary judgment on Count I.

## B. All Other Claims (Counts II, III, and X)

The Court has discretion to decline supplemental jurisdiction over Plaintiff's remaining state law claims.  28 U.S.C. § 1367(c)(3); *see also id.* § 1367(d) (tolling the relevant statute of limitations "while the claim is pending [in federal court] and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period").  The Eleventh Circuit has encouraged district courts to dismiss supplemental state law claims where, as here, a plaintiff's federal claims have been dismissed prior to trial.  *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004); *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997).  Plaintiff's remaining claims will therefore be dismissed without prejudice.

## IV.    CONCLUSION

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff's Motion for Partial Summary Judgment (Doc. 117) is **DENIED** as to Count I and **DENIED without prejudice** in all other respects.

2. Defendants' Motion for Final Summary Judgement (Doc. 119) is **GRANTED** as to Count I and **DENIED without prejudice** in all other respects.

3. Counts II, III, and X of the Corrected Second Amended Complaint (Doc. 44) are **DISMISSED without prejudice**.

4. The Clerk is directed to enter judgment in favor of Kunovich, and against Plaintiff, on Count I.  Thereafter, the Clerk shall terminate all pending motions and close this case.

**DONE AND ORDERED** in Jacksonville, Florida on April 17, 2026.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

19